[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Atty. John H. Kearney, Juvenile Prosecutor.
Atty. James J. Connolly, Public Defender.
MEMORANDUM OF DECISION ON A MOTION TO TRANSFER
CT Page 4215
By motion filed in this court on July 20, 1995, the Waterbury prosecutor for Juvenile Matters (then called Advocate) seeks to transfer Kenneth C. (hereinafter Kenny) to the adult criminal docket of the Superior Court for trial and, if convicted, for sentencing as an adult for the crime of felony murder, a violation of Sec. 53a-54c of the Conn. Gen. Stats. (Rev. 1995), pursuant to provisions regarding mandatory transfer of children charged with the commission of certain felonies found in Sec.46b-127 (1). The state also seeks such transfer for the crime of robbery in the first degree, a violation of Sec. 53a-134, under a provision of the statutes, Sec. 46b-127(2)(B), in effect for a single year, from October 1, 1994 (July Sp. Sess. P.A. 94-2, S. 6) to October 1, 1995 (P.A. 95-225, S. 13).
Continued at request of defense counsel for a variety of valid reasons, the hearing was conducted on April 23 and 24, 1996. At the conclusion of the state's case, probable cause was found to believe that Kenny and another, in the course of committing robbery, had caused the death of Edward Keller on 5/30/95, thus committing felony murder within the definition of the statute:
 A person is guilty of murder when, acting . . . with one or more persons, he. . . . attempts to commit robbery . . . and, in the course of and in furtherance of such crime . . . he, or another participant, if any, causes the death of a person other than one of the participants . . .
This conclusion was based upon the following findings of facts derived from the evidence offered by the state:
 1. Kenny was born on December 10, 1980. He was therefore fourteen and one-half years old on May 30, 1995. (State's Exhibit A.)
 2. Edward Keller, then eighteen years old, died on May 30, 1995 in St. Mary's Hospital where he had been brought earlier that day after being found in the front seat of a motor vehicle at the corner of North Main and West Farms Streets in Waterbury with a fatal gunshot wound to the head. (State's Exhibit B.)
3. Kenny was one of a group of four black youths sitting on a wall CT Page 4216 at the corner of North Main and East/West Farms after midnight on May 30, 1995 when a car pulled up with two men inside who asked to buy marijuana. Advised to go up the street, the car did so, but soon returned to the corner. Kenny, identified in court by witness Youssef L., and another youth called "Main" detached themselves from the others and walked up to the car. Moments later, two gunshots were heard. (Testimony of Youssef L., a juvenile, who testified to this extent from his present recollection of the events of May 30, 1995, in the presence of his mother, after being granted immunity from any further prosecution arising from the events to which he testified.)
 4. Ed Keller was driving with Angel Torres as a passenger on the night of May 29-30, 1995. Both were over eighteen years old at the time. After midnight, they arrived at the corner of North Main and East/West Farms seeking to buy marijuana. When they asked four black youths, all dressed alike and standing at that corner, where they could make such a purchase, they were advised to go behind the corner building. They did so but having been told by a man with a dog that no such purchase could be made at that place, Ed and Angel returned to the corner of North Main and East/West Farms and parked. Two of the four black males then detached themselves from the others and approached their car, one on each side. Both youths carried guns which they pointed at both the driver and the passenger in the car while demanding money. While Angel was demonstrating to the youth on his (the passenger) side of the car that his wallet was empty, he heard a gunshot and turned to see Ed lying unconscious, his money still clutched in his hand. A second shot was fired. Both black males then left. After trying vainly to move Ed's body enough to be able to drive the car himself, Angel flagged down a police car. (Testimony of Angel Torres, April 23, 1996.)
Upon the finding of probable cause, defense counsel made an offer of proof that another of the four similarly-garbed black males named in court by Youssef as being present at the scene of the killing, had been identified by him eleven months earlier as the shooter. Since the identity of the shooter was not material for the purpose of finding probable cause for felony murder within the portion of the statutory definition quoted above, this offer was not accepted. Other evidence sought to be offered by the defendant related to Youssef's mental state at the time of making a statement to the police on the day of the episode (State's Exhibit C). This, too, was rejected since the finding of probable cause was based upon the witness's recollection of the event at the time of giving his testimony. (Subsection (b) of Sec. 54-46a, incorporated by reference in subsection (b) of Sec.46b-127.) CT Page 4217
The court also found probable cause to believe Kenny was a participant in committing robbery in the first degree within the following definition:
 A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in Section 53a-133 . . . he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver . . . or other firearm . . .
A robbery, under the definition in Sec. 53a-133, requires not a completed larceny, as suggested by defense counsel, but only the use, or threatened immediate use, of physical force upon another person for the purpose of compelling such person to deliver up the property in the course of committing a larceny. The testimony of Angel Torres supports the finding that both black youths who approached the car in which he and the victim were parked had guns and demanded money; the testimony of Youssef L. supports the finding that Kenny was one of the two youths who approached that car.
Under the then terms of Sec. 46b-127 (c), upon the finding of probable cause on the robbery count, Kenny had ". . . the right to present evidence that he should not be transferred to the regular criminal docket because (1) he is a person with mental retardation, as defined in section 1-1g, or (2) he suffers from a substantial mental disorder, as defined in section 17a-75 . . ." While he had originally requested to present evidence in avoidance of the transfer on both grounds, the first was withdrawn during the testimony of Dr. Ramos-Grenier, the clinical evaluator whose report was submitted as the respondent's Exhibit 1 and who testified unequivocally that Kenny was not mentally retarded. Her report, dated September 23, 1995, was based upon three sessions lasting three to four hours each which took place between August 2 and September 13, 1995. After exhaustive neuropsychological testing, Kenny was determined to have "significant brain dysfunction". (Respondent's Exhibit 1, p. 6.) Specifically, he obtained a neuropsychological deficit scale score (NDS) of 48 which falls above the cut-off score of 44, below which no such degree of impairment is found. In CT Page 4218 cross-examination, however, Dr. Ramos-Grenier explained that the upper scores go "into the hundreds". Since she has found some degree of impairment in sixty percent of the several hundred examinations she has conducted (testimony of April 24, 1996), a score of four points above the normal "cut-off" out of a total possible score in the hundreds would not appear to be a major factor in determining behavior. This is made clearer in her reports detailing the bases for this NDS score: Eliminating cultural bias, his full-scale IQ was 80 (Id. p. 7); his scores on tests for Freedom from Distractibility, Memory and Learning, attention/concentration, Memory for Sentences and sequential recall all fall within the average range. Impaired scores were noted on the Seashore Rhythm Test, measuring ability to respond simultaneously to multiple task demands; on certain memory subtests (Id. p. 8); visuospatial skills (Id. p. 9); oral and written language (Id. p. 10). Despite these, and other, below-average scores, he scored high on a Mazes subtest which "shows good planning ability" (Id. p. 9) and an average score on a subtest requiring decoding skills (Id. p. 9). In socio-emotional functioning, he was tested as showing "a condition of intense distress . . . accompanied by a desire to gain sympathy and assistance". (Id. p. 11) His test scores reflected depression and anxiety, irritability, "a tendency to lose control and damage things or become physically threatening or abusive toward others", behaviors "clearly related to his difficulties with problem solving and organized thinking due to his cognitive/brain impairment." (Id. p. 12)
Her Diagnostic Impressions (Id. p. 13) were of Major Depression, Single Episode; Generalized Anxiety Disorder; Conduct Disorder; Alcohol Abuse; Poly Substance Abuse; and "Rule Out Bipolar Disorder". In her concluding paragraph, the evaluator states:
 The results of the present evaluation clearly indicate that Kenneth is suffering from significant brain impairment, which is diffuse in nature, but which appears to be affecting left hemisphere functions more significantly. Areas of specific weakness/deficit include: complex sensory perception; fine-motor coordination and grapho-motor skills; attention/concentration for complex material; short-and longer-term verbal memory; abstract visual memory; visual alertness and tracking; visual-motor integration; receptive and expressive language; mathematics ability; writing ability; abstract reasoning and problem solving, and mental flexibility; and socio-emotional functioning . . . substance abuse CT Page 4219 further impairs his cognitive functioning, and his ability to engage in effective problem solving." (Id. p. 13-14.)
She recommended a psychiatric evaluation to determine the presence of a possible Bipolar Disorder and the possible benefit from medication for that condition, if found, as well as for depression and anxiety. She further recommended structured treatment — ideally inpatient — for his substance abuse problem, psychotherapy for the depression and anxiety and special education to address his learning deficits (Id. p. 13-14).
Based upon the foregoing, it was found that Kenny did not suffer from "a substantial mental disorder, as defined in section 17a-75 as:
 . . . a mental or emotional condition which has substantial adverse effects on a child's ability to function so as to jeopardize his or her health, safety or welfare or that of others . . .
While Sec. 17a-75 defines "mental disorder" under Chapter 319, Part II relating to "Commitment of Mentally Ill Children", a child with such disorder may not be confined unless a court finds by clear and convincing evidence that he not only suffers from such disorder, but is also in need of hospitalization for treatment which exists, is available and is the least restrictive available alternative (Subsection (e) of Sec. 17a-75). There is no question that to defeat a transfer under Sec. 46b-127(a)(2)(B), a juvenile need only prove by a preponderance of the evidence that he suffers from a "substantial mental disorder", not that he is necessarily committable under Sec. 17a-77. But the testimony and documentary evidence offered through Dr. Ramos-Grenier falls short on three grounds:
1. No evidence was offered to support the conclusion that his "significant brain impairment" functions "so as to jeopardize his . . . health, safety or welfare or that of others". Certainly the health, safety and welfare of others is always jeopardized by the exercise of poor judgment, impulsivity, anger and the other emotions found in Kenny and in other juveniles reacting to the frustrations of intellectual or motor deficits. But the jeopardy is not the result of such impairment.
2. The psychologist's mild recommendation for a psychiatric evaluation and consideration of medication either for his CT Page 4220 depression or a possible bi-polar disorder — presumably not urgent enough to have been pursued in the seven months following promulgation of her recommendations — cannot support the conclusion that he suffers from "a mental or emotional condition which has substantial adverse effects on [his] . . . ability to function".
3. Even if Kenny's minutely described neuropsychological condition were to be deemed a "mental disorder" within the definition of Sec. 17a-75, his scoring of barely over the "cut-off" line on the NDS impairment scale does not support the term "substantial".
If the conclusions reached after the exhaustive evaluation conducted by Dr. Ramos-Grenier, found in 60% of the hundreds of children she has tested, were to be deemed sufficient to preclude a transfer under the operative language of Sec. 46b-127, subsection (c), then almost no child who has allegedly committed any of the serious offenses enumerated in subsection (a)(2) could ever have been transferred to the adult court. This short-lived legislation, passed in Special Session in July of 1994, was clearly a measure designed to strengthen, not dilute, the public response to serious crimes committed by juveniles. That purpose was underscored in retrospect just nine months after the effective date of that provision when the General Assembly deleted ALL such barriers to the transfer of juveniles alleged to have committed armed robbery and less serious juvenile offenses. (P.A. 95-225, section 13.). The interpretation of this language asserted by Kenny's counsel in his motion to reargue (denied on the papers) would lead to a "bizarre result" which is anathema to judicial interpretation of ambiguous statutory language. See InRe 83-CD, 189 Conn. 276 (1983); In Re Adrien C., 9 Conn. App. 506
(1986); In Re Jessica M., 217 Conn. 459, 467 ff. (1991). In the absence of any evidence that Kenny was incapable of knowing right from wrong or of conforming his conduct to avoid wrongdoing, there is no reason grounded in logic or in statutory language to preclude his transfer to the adult criminal court. The juvenile justice system has exhausted its resources on this young man: He has twice been committed to the Department of Children and Families, originally for placement in a residential facility where he could receive the special education he requires; subsequently for placement at Long Lane School. Since there is probable cause to believe he, with another, committed an armed robbery, the brain impairment identified by the tests administered by Dr. Ramos-Grenier does not rise to the level of a CT Page 4221 "serious mental disorder" sufficient to bar his transfer to the adult criminal docket of the Superior Court under the then applicable statute.
It is therefore ordered that Kenneth C. be forthwith transferred to the regular criminal docket for the Waterbury Judicial District for further proceedings on the charge of felony murder and robbery in the first degree committed on May 30, 1995 in the city of Waterbury.
Entered at Waterbury this 6th day of May, 1996
Frederica S. Brenneman, Judge